(Slip Opinion)     OCTOBER TERM, 2016     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SHAW *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 15–5991.   Argued October 4, 2016—Decided December 12, 2016

Petitioner Shaw used identifying numbers of a bank account belonging to bank customer Hsu in a scheme to transfer funds from that account to accounts at other institutions from which Shaw was able to obtain Hsu's funds.  Shaw was convicted of violating 18 U. S. C. §1344(1), which makes it a crime to "knowingly execut[e] a scheme . . . to defraud a financial institution."  The Ninth Circuit affirmed.

*Held*:

  1. Subsection (1) of the bank fraud statute covers schemes to deprive a bank of money in a customer's deposit account.  Shaw's arguments in favor of his claim that subsection (1) does not apply to him because he intended to cheat only a bank depositor, not a bank, are unpersuasive.

  First, the bank did have property rights in Hsu's bank deposits: When a customer deposits funds, the bank ordinarily becomes the owner of the funds, which the bank has a right to use as a source of loans that help the bank earn profits.  Sometimes, the contract between the customer and the bank provides that the customer retains ownership of the funds and the bank only assumes possession; even then, the bank has a property interest in the funds because its role is akin to that of a bailee.  Hence, for purposes of the bank fraud statute, a scheme fraudulently to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a "financial institution," at least where, as here, the defendant knew that the bank held the deposits, the funds obtained came from the deposit account, and the defendant misled the bank in order to obtain those funds.

  Second, Shaw may not have intended to cause the bank financial harm, but the statute, while insisting upon "a scheme to defraud,"

demands neither a showing that the bank suffered ultimate financial loss nor a showing that the defendant intended to cause such loss. This Court has found no case that interprets the statute as Shaw does. Cf. *Carpenter* v. *United States*, 484 U. S. 19, 26.

Third, that Shaw may have been ignorant of relevant bank-related property law is no defense to criminal prosecution for bank fraud. Shaw knew that the bank possessed Hsu's account, Shaw made false statements to the bank, Shaw believed that those false statements would lead the bank to release from that account funds that ultimately and wrongfully ended up with Shaw, and the bank in fact possessed a property interest in the account. These facts are sufficient to show that Shaw knew that he was entering into a scheme to defraud the bank even if he was not aware of the niceties of bank-related property law. Cf. *Pasquantino* v. *United States*, 544 U. S. 349, 355–356.

Fourth, Shaw mistakenly contends that the statute requires the Government to prove not just that he acted with the *knowledge* that he would likely harm the bank's property interest but also that such was his *purpose.* This Court has found no relevant authority supporting the view that a statute making criminal the *"knowin[g] ex-ecut[ion of] a scheme . . . to defraud"* requires something more than knowledge. *Allison Engine Co.* v. *United States ex rel. Sanders*, 553 U. S. 662, 665–668; *Tanner* v. *United States*, 483 U. S. 107, 110–112; *United States* v. *Cohn*, 270 U. S. 339, 343; and *Bridges* v. *United States*, 346 U. S. 209, 221–222, distinguished.

Fifth, subsection (2) of the bank fraud statute, which makes criminal the use of "false or fraudulent pretenses" to obtain "property . . . under the custody or control of" a bank, may overlap with subsection (1), but it does not do so completely. Thus, it should not be read as excluding from subsection (1) applications that would otherwise fall within the scope of subsection (1), such as the conduct at issue in this case. See *Loughrin* v. *United States*, 573 U. S. ___, ___, n. 4.

Finally, because the bank fraud statute is clear enough, the rule of lenity is not implicated. Pp. 2–8.

2. With regard to the parties' dispute over whether the District Court improperly instructed the jury that a scheme to defraud a bank must be one to deceive the bank *or* deprive it of something of value, instead of one to deceive *and* deprive, the Ninth Circuit is left to determine whether that question was properly presented and if so, whether the instruction given is lawful, and, if not, whether any error was harmless in this case. Pp. 8–9.

781 F. 3d 1130, vacated and remanded.

BREYER, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–5991

LAWRENCE EUGENE SHAW, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[December 12, 2016]

JUSTICE BREYER delivered the opinion of the Court.

A federal statute makes it a crime "knowingly [to] execut[e] a scheme . . . to defraud a financial institution," 18 U. S. C. §1344(1), for example, a federally insured bank, 18 U. S. C. §20. The petitioner, Lawrence Shaw, was convicted of violating this provision. He argues here that the provision does not apply to him because he intended to cheat only a bank depositor, not a bank. We do not accept his arguments.

## I

The relevant criminal statute makes it a crime:

"knowingly [to] execut[e] a scheme . . .

"(1) to defraud a financial institution; or

"(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." §1344.

Shaw obtained the identifying numbers of a Bank of America account belonging to a bank customer, Stanley

Hsu.  Shaw used those numbers (and other related infor-
mation) to transfer funds from Hsu's account to other
accounts at other institutions from which Shaw could
obtain (and eventually did obtain) Hsu's funds.  Shaw was
convicted of violating the first clause of the statute, namely,
the prohibition against "defraud[ing] a financial insti-
tution."  The Ninth Circuit affirmed his conviction.  781
F. 3d 1130 (2015).  Shaw then filed a petition for certiorari
arguing that the words "scheme to defraud a financial
institution" require the Government to prove that the
defendant had "a specific intent not only to deceive, but
also to cheat, a *bank*," rather than "a *non-bank* third
party."  Pet. for Cert. i.  We granted review.

## II

Shaw makes several related arguments in favor of his
basic claim, namely, that the statute does not cover
schemes to deprive a bank of customer deposits.  First, he
says that subsection (1) requires "an intent to wrong a
victim bank [a 'financial institution'] *in its property
rights . . . .*"  Brief for Petitioner 23.  He adds that the
property he took, money in Hsu's bank account, belonged
to Hsu, the bank's customer, and that Hsu is not a "finan-
cial institution."  *Id.,* at 25, 45.  Hence Shaw's was a
scheme "designed" to obtain only "a bank *customer's* prop-
erty," not "a bank's *own* property."  *Id.,* at 24–25.

The basic flaw in this argument lies in the fact that the
bank, too, had property rights in Hsu's bank account.
When a customer deposits funds, the bank ordinarily
becomes the owner of the funds and consequently has the
right to use the funds as a source of loans that help the
bank earn profits (though the customer retains the right,
for example, to withdraw funds).  5A Michie, Banks and
Banking, ch. 9, §1, pp. 1–7 (2014) (Michie); *id.,* §4b, at 54–
58; *id.,* §38, at 162; *Phoenix Bank* v. *Risley*, 111 U. S. 125,
127 (1884).  Sometimes, the contract between the customer

and the bank provides that the customer retains owner-
ship of the funds and the bank merely assumes possession.
Michie, ch. 9, §38, at 162; *Phoenix Bank, supra*, at 127.
But even then the bank is like a bailee, say, a garage that
stores a customer's car. Michie, ch. 9, §38, at 162. And as
bailee, the bank can assert the right to possess the depos-
ited funds against all the world but for the bailor (or, say,
the bailor's authorized agent). 8A Am. Jur. 2d, Bailment
§166, pp. 685–686 (2009). This right, too, is a property
right. 2 W. Blackstone, Commentaries on the Laws of
England 452–454 (1766) (referring to a bailee's right in a
bailment as a "special qualified property"). Thus, Shaw's
scheme to cheat Hsu was also a scheme to deprive the
bank of certain bank property rights.

Hence, for purposes of the bank fraud statute, a scheme
fraudulently to obtain funds from a bank depositor's ac-
count normally is also a scheme fraudulently to obtain
property from a "financial institution," at least where, as
here, the defendant knew that the bank held the deposits,
the funds obtained came from the deposit account, and the
defendant misled the bank in order to obtain those funds.

Second, Shaw says he did not intend to cause the bank
financial harm. Indeed, the parties appear to agree that,
due to standard banking practices in place at the time of
the fraud, no bank involved in the scheme ultimately
suffered any monetary loss. Brief for Petitioner 4; Brief
for United States 4, 27–28. But the statute, while insist-
ing upon "a scheme to defraud," demands neither a show-
ing of ultimate financial loss nor a showing of intent to
cause financial loss. Many years ago Judge Learned Hand
pointed out that "[a] man is none the less cheated out of
his property, when he is induced to part with it by fraud,"
even if "he gets a quid pro quo of equal value." *United
States* v. *Rowe*, 56 F. 2d 747, 749 (CA2 1932). That is
because "[i]t may be impossible to measure his loss by the
gross scales available to a court, but he has suffered a

wrong; he has lost," for example, "his chance to bargain with the facts before him." *Ibid.* Cf. O. Holmes, The Common Law 132 (1881) ("[A] man is liable to an action for deceit if he makes a false representation to another, knowing it to be false, but intending that the other should believe and act upon it"); *Neder* v. *United States*, 527 U. S. 1, 21–25 (1999) (bank fraud statute's definition of fraud reflects the common law).

It is consequently not surprising that, when interpreting the analogous mail fraud statute, we have held it "sufficient" that the victim (here, the bank) be "deprived of its right" to use of the property, even if it ultimately did not suffer unreimbursed loss. *Carpenter* v. *United States*, 484 U. S. 19, 26–27 (1987). Lower courts have explained that, where cash is taken from a bank "but the bank [is] fully insured[,] [t]he theft [is] complete when the cash [i]s taken; the fact that the bank ha[s] a contract with an insurance company enabling it to shift the loss to that company [is] immaterial." *United States* v. *Kucik*, 844 F. 2d 493, 495 (CA7 1988). And commentators have made clear that "on the criminal side, it is generally held that the lack of financial loss is no defense to false pretenses." 2 W. LaFave & A. Scott, Substantive Criminal Law §8.7(i)(3), p. 404 (1986). We have found no case from this Court interpreting the bank fraud statute as requiring that the victim bank ultimately suffer financial harm, or that the defendant intend that the victim bank suffer such harm.

Third, Shaw appears to argue that, whatever the true state of property law, he did not *know* that the bank had a property interest in Hsu's account; hence he could not have intended to cheat the bank of its property. Shaw did know, however, that the bank possessed Hsu's account. He did make false statements to the bank. He did correctly believe that those false statements would lead the bank to release from that account funds that ultimately and wrongfully ended up in Shaw's pocket. And the bank did in

fact possess a property interest in the account. These facts are sufficient to show that Shaw knew he was entering into a scheme to defraud the bank even if he was not aware of the niceties of bank-related property law. To require more, *i.e.,* to require actual knowledge of those bank-related property-law niceties, would free (or convict) equally culpable defendants depending upon their property-law expertise—an arbitrary result. We have found no case from this Court requiring legal knowledge of the kind Shaw suggests he lacked. But we have found cases in roughly similar fraud-related contexts where this Court has asked only whether the targeted property was in fact property in the hands of the victim, not whether the defendant knew that the law would characterize the items at issue as "property." See *Pasquantino* v. *United States*, 544 U. S. 349, 355–356 (2005) (Canada's right to uncollected excise taxes on imported liquor counted as "property" for purposes of the wire fraud statute); *Carpenter*, *supra*, at 25–26 (a newspaper's interest in the confidentiality of the contents and timing of a news column counted as property for the purposes of the mail and wire fraud statutes). We conclude that the legal ignorance that Shaw claims here is no defense to criminal prosecution for bank fraud.

Fourth, Shaw argues that the bank fraud statute requires the Government to prove more than his simple *knowledge* that he would likely harm the bank's property interest; in his view, the Government must prove that such was his *purpose.* See *Voisine* v. *United States*, 579 U. S. ___, ___ (2016) (slip op., at 4) ("knowingly" committing an assault requires an awareness "'that [harm] is practically certain,'" whereas "purposefully" committing an assault is "to have that result as a 'conscious object'" (quoting ALI, Model Penal Code §§2.02(2)(a)–(b) (1962))). Shaw adds that his purpose was to take money from Hsu; taking property from the bank was not his *purpose.*

But the statute itself makes criminal the "*knowin[g]*

execut[ion of] a scheme . . . to defraud." To hold that
something other than knowledge is required would as-
sume that Congress intended to distinguish, in respect to
states of mind, between (1) the fraudulent scheme, and (2)
its fraudulent elements. Why would Congress wish to do
so? Shaw refers us to a number of cases involving fraud
against the Government and points to language in those
cases suggesting that the relevant statutes required that
the defendant's purpose be to harm the statutorily pro-
tected target and not a third party. Brief for Petitioner
25–29. But in two of those cases, the fraudulent state-
ment was made not to the Government but to the third
party—a circumstance not present here. See *Allison
Engine Co.* v. *United States ex rel. Sanders*, 553 U. S. 662,
665–668 (2008); *Tanner* v. *United States*, 483 U. S. 107,
110–112 (1987). In the third, the relevant portion of the
statute expressly required a false statement "'for the
*purpose* . . . of . . . defrauding the Government of the United
States.'" *United States* v. *Cohn*, 270 U. S. 339, 343
(1926) (emphasis added). As for the fourth case, the lan-
guage Shaw cites states the uncontroversial proposition
that "defrauding or attempting to defraud the United
States" means "fraud against the Government." *Bridges* v.
*United States*, 346 U. S. 209, 221–222 (1953). In any
event, these cases all involved crimes of fraud targeting
the Government—an area of the law with its own special
rules and protections. We have found no relevant authority
in the area of mail fraud, wire fraud, financial frauds, or
the like supporting Shaw's view.

Fifth, Shaw, reading the bank fraud statute as a whole,
urges us to compare subsection (1) with subsection (2).
*Supra,* at 1. Subsection (2), he points out, makes criminal
the use of "false or fraudulent pretenses" to obtain "prop-
erty . . . under the custody or control of" a bank. And in
his view that fact means that we should read subsection
(1) not to apply to those circumstances. That is to say,

given the language of subsection (2), efforts such as his effort fraudulently to obtain money deposited in a bank account should not fall within the scope of the subsection (1) phrase "scheme . . . to defraud a financial institution." Brief for Petitioner 30–33.

As we read the two subsections, however, they do not demand that interpretation. The two subsections overlap substantially but not completely. Subsection (2) makes criminal the use of a scheme

> "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

This language covers much that subsection (1) also covers, for example, making a false representation to a bank in order to obtain property belonging to that bank. See *Loughrin* v. *United States*, 573 U. S. ___, ___–___, n. 4 (2014) (slip op., at 6–7, n. 4) (recognizing the "substantial" overlap between the two subsections and noting that such overlap "is not uncommon in criminal statutes"). At the same time, it applies to a circumstance in which a shopper makes a false statement to a department store cashier in order to pay for goods with money "under the custody or control of a financial institution," say, Bank A. The shopper's false statement, though designed to obtain Bank A's property, might well not amount to an effort (under subsection (1)) to defraud Bank A (since the statement was made not to Bank A but to an agent of the department store). Given, on the one hand, the overlap and, on the other hand, a plausible reading of the language that applies it to circumstances significantly different from those at issue here, we have no good reason to read subsection (2) as excluding from subsection (1) applications that would otherwise fall within the scope of subsection (1),

such as conduct of the kind before us.

Finally, Shaw asks us to apply the rule of lenity. Brief for Petitioner 40–41. We have said that the rule applies if "at the end of the process of construing what Congress has expressed," *Callanan* v. *United States*, 364 U. S. 587, 596 (1961), there is "'a grievous ambiguity or uncertainty in the statute,'" *Muscarello* v. *United States*, 524 U. S. 125, 138–139 (1998) (quoting *Staples* v. *United States*, 511 U. S. 600, 619, n. 17 (1994)). The statute is clear enough that we need not rely on the rule of lenity. As we have said, a deposit account at a bank counts as bank property for purposes of subsection (1). *Supra,* at 2–3. The defendant, in circumstances such as those present here, need not know that the deposit account is, as a legal matter, characterized as bank property. *Supra*, at 4–5. Moreover, in those circumstances, the Government need not prove that the defendant intended that the bank ultimately suffer monetary loss. *Supra,* at 3–4. Finally, the statute as applied here requires a state of mind equivalent to knowledge, not purpose. *Supra*, at 5–6.

## III

Shaw further argues that the instructions the District Court gave the jury were erroneous. He points out that the District Court told the jury that the

> "phrase 'scheme to defraud' means any deliberate plan of action or course of conduct by which someone intends to deceive, cheat, *or* deprive a financial institution of something of value." App. 18 (emphasis added).

This instruction, Shaw says, could be understood as permitting the jury to find him guilty if it found no more than that his scheme was one to deceive the bank but not to "*deprive*" the bank of anything of value. Brief for Petitioner 22–23. The parties agree, as do we, that the scheme

must be one to deceive the bank *and* deprive it of something of value.

For reasons previously pointed out, we have held that a plan to deprive a bank of money in a customer's deposit account is a plan to deprive the bank of "something of value" within the meaning of the bank fraud statute. The parties dispute whether the jury instruction is nonetheless ambiguous or otherwise improper. We leave to the Ninth Circuit to determine whether that question was fairly presented to that court and, if so, whether the instruction is lawful, and, if not, whether any error was harmless in this case.

For these reasons, the judgment of the Ninth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*